IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


**KELLY K. COOK**,

          Plaintiff,

   v.

**MICHAEL J. ASTRUE**, Commissioner
of Social Security,

    Defendant.

Case No. CV10-526-SU

**FINDINGS AND
RECOMMENDATION**


Rory Linerud
P.O. Box 1105
Salem, Oregon 97308
     Attorney for plaintiff

Dwight C. Holton
United States Attorney
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

Gerald J. Hill
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900
Seattle, Washington 98104
     Attorneys for defendant


Findings and Recommendation Page 1

SULLIVAN, Magistrate Judge:

Kelly Cook brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance benefits ("DIB") under Title II of the Social Security Act.

## PROCEDURAL BACKGROUND

Ms. Cook filed an application for DIB on April 24, 2006. The claim was denied initially and upon reconsideration. Ms. Cook requested a hearing, which was held before administrative law judge ("ALJ") Catherine Lazuran on October 29, 2008. The ALJ issued a decision on July 1, 2009, finding Ms. Cook not disabled. When the Appeals Council denied a request for review, the ALJ's decision became the final decision of the Commissioner.

Ms. Cook was born in 1968, and was 41 years old at the time of the ALJ's decision. Her date last insured is September 30, 1998. A DIB claimant must establish that the current disability began on or before the date last insured. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). She alleges disability beginning September 4, 1996, based on chronic self-injuring behavior, Bipolar II Disorder,[1] Personality Disorder,[2] and Factitious Disorder.[3] She has not engaged in substantial

---

[1] Bipolar II Disorder is characterized by the occurrence of one or more Major Depressive Episodes accompanied by at least one Hypomanic Episode. The symptoms must cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 392 (4th ed. Text Revision 2000) ("*DSM-IV-TR*").

[2] In general, personality disorders of all types share "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse control." *DSM-IV-TR* at 686. This pattern is "inflexible and pervasive across a broad range of personal and social situations," and "leads to clinically significant

gainful activity since her alleged onset date.  She has a high school education.

## THE SEQUENTIAL EVALUATION

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.  At step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c).  If the impairment is severe, the evaluation proceeds to the third step, where the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41.  If a claimant's impairment meets or equals one of the listed impairments, she is considered disabled without consideration of her age,

---

distress or impairment in social, occupational or other important areas of functioning.  The pattern is stable and of long duration, and its onset can be traced back at least to adolescence or early adulthood." *Id*.

[3] Factitious Disorder is the intentional production of physical signs or symptoms.  The presentation may include self-inflicted conditions, such as the production of abscesses by injection of foreign substances.  The motivation for the behavior is to assume the sick role.  External incentives for the behavior, such as economic gain, avoiding legal responsibility, or improving physical well-being, are absent.  *DSM-IV-TR* at 513.

Findings and Recommendation Page 3

education or work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant shows an inability to perform her past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity ("RFC") to do other work in consideration of the claimant's age, education and past work experience.  Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

## MEDICAL EVIDENCE

### A.   Before date last insured

In July 1995, Ms. Cook developed cellulitis in her left arm.  She was admitted to Edgar Davis Memorial Hospital on July 31, 1995 for IV antibiotics and pain control.  She denied recent trauma to the left arm or injections, and it was noted that she had no history of infectious disease. Oral administration of Keflex and injections of Rocephin gave no improvement.  Tr. 328-353.

On August 1, 1995, she was transferred to Seton Medical Center for a higher level of care.  A blood culture at the time of admission was positive for Enterococcus.  A sonogram revealed that the infection had progressed into muscle tissue.  On August 6, 1995, Ms. Cook underwent incision and drainage with decompression fasciotomy of the left elbow and forearm, incision and drainage of the left upper arm, and placement of multiple drains.  A culture obtained during surgery revealed multiple organisms, including Escherichia coli ("E. coli"), (intestinal flora), Streptococcus veridans (flora of the mouth), Klebsiella pneumoniae (intestinal flora), Peptostreptococcus, (flora of the mouth), and Propionbacterium, (flora of the skin).  The source

of the infection was suspected to be a non-sterile injection.  Tr. 359-386, 763-70.  According to a written statement Ms. Cook provided to Social Security on December 11, 2008 ("Social Security statement"), tr. 270-77, she had filled a syringe with feces and dirt and tried to inject it into the vein in her left arm; she missed, however, and injected it into her inner elbow.  Tr. 272.

In February 1997, Ms. Cook was seen for a laceration on the bottom of the left foot.  She reported stepping on a piece of glass, but an x-ray did not reveal any foreign body within the soft tissues.  She underwent surgery for a plantar abscess.  Cultures of the abscess revealed Bacteroides caccae (intestinal flora), Clostridium perfringens (intestinal flora), E. coli, and Enterococcus faecium (digestive tract flora).  Tr. 419-443, 773.  According to Ms. Cook's Social Security statement, she had sliced her foot with an Xacto knife, then injected the cut with feces.  Tr. 273.

Between July 1, 1997 and April 9, 2001, Ms. Cook saw Betsy Neeley, M.D. for routine medical care, primarily weight loss.  Tr. 444-51.  On July 1, 1997, Dr. Neeley noted that Ms. Cook had had a "significant infection in her left arm stemming from an insect bite" two years earlier, for which she was hospitalized and treated with IV antibiotics, and that about three months earlier, she had developed a staph infection in the left foot which also required IV antibiotics.  Tr. 451.  On December 8, 1997, Ms. Cook saw Dr. Neeley for back pain, diagnosed as inflammation of the sciatic nerve.  Tr. 449.

According to Ms. Cook's Social Security statement, she swallowed dish detergent in April 1997.  In June 1998, she inhaled bleach and oven cleaner to simulate pneumonia.  Tr. 273.

**B.    After date last insured**

On September 29, 1999, Ms. Cook saw Dr. Neeley for an abrasion on the surface of her

left hand, which Ms. Cook reported as the result of a fall into a brush pile.  Tr. 448, 695-702,

778.  Dr. Neeley diagnosed "mild cellulitis developing in the left hand and distal left forearm,"

and started her on oral Keflex, but she did not improve.  Tr. 448.

She was admitted to Edgar Davis Memorial hospital for IV therapy.  At the time of

admission, there was cellulitis at the hypothenar eminence of the left hand.  She was discharged

with an outpatient antibiotic pump, but failed to improve and was readmitted for IV antibiotic

therapy.  Cultures showed Staphylococcus in the nose and Bacteroides fragilis (intestinal flora)

and Eubacterium lentum (fecal bacteria) in the blood.  Tr. 448, 778-781.  Her physician, Dr.

Warren, noted:

> The patient has been in generally good health but has had repetitive problems with
> soft tissue infections.  This is the third episode of fairly significant problems with
> getting over these types of injuries.  She has had a previous left forearm problem
> and a previous foot problem which required incision and drainage, and which
> caused sepsis.

Tr. 779.  Dr. Warren queried "whether the patient is some type of staff carrier or possibly has

some type of immune deficiency to cause this ongoing problem."  Tr. 779.  According to Ms.

Cook's Social Security statement, she had cut her hand and injected it with feces.  While on the

IV, she had injected the IV with feces.  Tr. 274.

On October 11, 1999, Ms. Cook was discharged from the hospital on oral antibiotics.

Her peripherally inserted central catheter "(PICC") line tip was cultured, and revealed guaiac-

negative Staphylococcus and diphtheroids (vaginal flora).  Tr. 782.  She was diagnosed as a staff

carrier.  *Id.*

On October 15, 1999, Dr. Neeley saw Ms. Cook for "follow-up after being hospitalized

for a bacteremia of bacteroides fragilis.  She also grew Eubacterium lentum."  Tr. 448.  Dr.

Findings and Recommendation Page 6

Neeley also thought Ms. Cook was a staph carrier. *Id.*

 In November 1999, Ms. Cook was admitted to Grande Ronde hospital for fever, abdominal pain, and a pulmonary embolus ("PE"), possibly secondary to pelvic inflammatory disease. On November 12, 1999 she had surgery for incision and drainage of a rectovaginal abscess. Tr. 684-85, 686-87, 785. The drainage grew E. coli, Streptococcus B, Enterococcus and Peptostreptococcus. Tr. 447, 785-86. According to Ms. Cook's Social Security statement, she had injected herself with feces to "try to get infection into uterus." On November 24, 1999, she saw Dr. Neeley for follow-up after treatment of the abscess and the PE. Tr. 447. Dr. Neeley note that she was on Coumadin for the PE, and recommended that she continue on Coumadin for three months. Tr. 447.

Ms. Cook has stated that she slammed her hand in a door after taking 10 times the prescribed dose of Coumadin. Tr. 274, 447, 703. She reported the injury, but not the Coumadin overdose, to Dr. Neeley. An x-ray was negative, and Dr. Neeley recommended that she wrap her hand in an Ace bandage and apply ice. Tr. 447.

On February 1, 2001, Ms. Cook saw Dr. Neeley for "major indigestion" over the last several months, worsening over the last few weeks. Tr. 446. Dr. Neeley thought it was heartburn, but placed her on Prevacid. Tr. 446. In March 2001, after an endoscopy, she was diagnosed with esophagitis and enterogastritis. Tr. 445-46, 788.

In August 2001, she was admitted to Grande Ronde hospital for swelling and discomfort at a mole excision site on the right calf. Ms. Cook reported at the hospital that eight days after the mole excision, she had gone camping, and that the sutures opened up and the wound became significantly contaminated with dirt. Tr. 790. She underwent surgical incision and drainage of

the abscess.  Tr. 789-90.  <u>See also</u> tr. 678-683.  According to her Social Security statement, she had injected the wound with dirt, then injected her IV with feces.  Tr. 274.

In February 2002, Ms. Cook cut the ring finger on her left hand, which required multiple drainage procedures and both IV and protracted oral antibiotics over a period of three weeks.  In September 2002, she cut her finger again, and after two and a half months on antibiotics, was referred to the hospital where she received IV antibiotics.  Tr. 799.

In October 2002, Ms. Cook underwent incision and drainage of an abscess on her right palm.  Cultures at that time grew out two strains of E. Coli, as well as Strep. viridans, Klebsiella, Veillonella (fecal bacteria), Hemophilus influenza, and diphtheroids.  It was noted by subsequent physicians that these were  "unusual organisms to be found in skin abscesses as they are found in the gut and in the oral flora."  Tr. 796.  <u>See also</u> tr. 675-677.  According to Ms. Cook's Social Security statement, she had infected both the cut and the IV.  Tr. 275.

On November 20, 2002, after continuing to spike fevers, she was admitted to the hospital for IV antibiotics.  On November 22, her PICC line was cultured and grew a colony of Candida albicans (vaginal flora).  Her physician suspected a white cell abnormality causing immune deficiency.  Tr. 791.

On November 26, 2002, Ms. Cook was admitted to OHSU for workup.  A chart note states, "[P]atient's history of recurrent soft tissue infection beginning in adult life is an unusual history for common immunodeficiency syndromes.  However, we will continue with the workup on an outpatient basis.  If workup on immunodeficiency proves to be negative, then factitious disorder is highly suspected."  Tr. 452-469, 792-97.

On February 18, 2003, Ms. Cook was admitted to OHSU for another workup.  Richard

Findings and Recommendation Page 8

Bryan, M.D., wrote that Ms. Cook had "a confusing history" of bacteremia without identifiable underlying cause. Tr. 472. He noted,

> The issue[] of Munchausen syndrome [i.e., Factitious Disorder] is a concern that is unfortunately difficult to authenticate and is not something that is easy for the patient to deal with. The patient denies self-induced disease and has several features that need to be evaluated before one could say that she has had a complete and thorough workup. . . .

Tr. 472.

According to Ms. Cook's Social Security statement, in March 2003, she burned herself on her fingertips. In August, she scraped her knee and injected it with feces. Tr. 275.

On September 27, 2003, Ms. Cook was admitted to St. Luke's medical center for recurrent fevers and bradycardia. It was noted that a scraped knee a month earlier had developed into cellulitis requiring two hospitalizations at Grande Ronde Hospital for incision and drainage and IV antibiotics. One day after being discharged from her second hospitalization, she developed fevers, arthralgia, and fatigue. At St. Luke's, an EKG showed a sinus bradycardia with no other abnormality. Her soft tissue infections were thought to be possible fungal bacteremia or bacterial colonization of her PICC line. She was continued on vancomycin. Tr. 475-477. A cardiac consultant, Colin Lee, M.D., found no significant cardiac abnormalities. Tr. 479-81.

According to Ms. Cook's Social Security statement, in November 2004, she fell and scraped her chin, then injected it with bacteria. Tr. 275. Her medical records show that she was admitted to Grande Ronde Hospital, where she was treated for several weeks with multiple antibiotics and five incision and drainage procedures. Tr. 488. The infection traveled down her neck, and eventually a catheter was placed in her chest wall for better vascular access. Tr. 490.

However, that site subsequently became infected and the catheter was removed.  *Id.*  Her wound cultures grew multiple organisms, and she continued to spike fevers while being administered antibiotics.  *Id.*  According to Ms. Cook's Social Security statement, she had infected the chest catheter.  Tr. 274.

Ms. Cook was admitted to the University of Utah Hospital on January 26, 2005, and remained until February 2, 2005, for treatment of a chest wall abscess.  Tr. 488-496.  Upon admission, it was noted that she had a history of multiple soft tissue infections occurring "over the course of the past nine years," and that the infections "generally occur after the patient injures herself either with glass or a knife."  Tr. 490.  The admitting physician wrote, "Typically, these episodes have occurred approximately twice a year for six to seven years and then for a period of 12 to 18 months they occur every couple of months, and over the last 6 to 12 months have occurred essentially monthly."  *Id.*  He thought her fevers suggested "inadequate inspection control," possible immune system dysfunction, antibiotic resistance or drug-induced fever.  Tr. 491.

In June 2005, according to her Social Security statement, Ms. Cook scraped her shin on a step and injected it with bacteria.  Tr. 275.  She was flown to the Mayo Clinic and remained there for 10 days.  *Id.*

On March 26, 2006, Ms. Cook was admitted to West Valley Medical Center after attempting suicide with an overdose of veterinary insulin.  Tr. 499-519, 719-721.  The treating physician, Lawrence Banta, M.D., wrote that about six months earlier, in October 2005,

> the patient came clean with her family after being confronted, in that she was producing a lot of symptoms that had caused her to be a medical mystery to a number of specialists over quite a number of years.  She had been injecting herself

> with feces, causing wounds, causing all kinds of medical problems resulting in
> numerous hospitalizations . . . .  When she finally came clean, she also indicated
> that she was doing it for the purpose of reducing distressing and depressive
> symptoms and it had been somewhat helpful over the years.  She had been
> experiencing significant mood swings to the depressive side, not much in the way
> of high energy moods but she did experience significant problems with racing
> thoughts that were very hard to turn off and that were very distressing. . . . Since
> disclosing the episodes of self induced illness, she began to have stronger urges to
> harm herself.  She was having more and more difficulty being able to avoid doing
> things to herself but people were watching her closely and all symptoms were
> subject to suspicion.  She had been contemplating suicide for some time.

Tr. 499.  Ms. Cook continued to have a strong desire to harm herself, and did not feel that she

could control those urges. *Id.*  Ms. Cook told Dr. Banta her symptoms began at about age 10,

when she set up a broken jar under her swing and jumped onto the glass.  *Id.*  Throughout her

adolescence there were minor self-inflicted wounds.  She said she had hit herself in the head with

a bat, causing a fracture of the maxilla; slammed her hand in a door; and then begun to introduce

fecal material into wounds.  Tr. 500.  Dr. Banta diagnosed Bipolar Disorder, Depressed; and

Factitious Disorder.  Tr. 501.  After individual and group therapy, Ms. Cook was discharged from

the hospital on April 11, 2006, with prescriptions for Ambien, Xanax, Campral, Cymbalta,

Tegrettol, and Lamictal, and told to follow up with Joe Rice, M.D., a psychiatrist.  Tr. 707-713,

503-04.

On June 19, 2006, Dorothy Anderson, Ph.D., Robert Henry, Ph.D., and Martin Kehrli,

Ph.D., reviewed Ms. Cook's medical records on behalf of the Commissioner.  They concluded

that there was insufficient evidence to substantiate the presence of any mental disorder.  Tr. 521-

36.

Ms. Cook began treatment with Dr. Rice on September 21, 2006, seeing him every other

week.  Dr. Rice has stated that he treated her illness as an addiction to self-injury and being ill,

along with Bipolar II Disorder, but that she had been consistently depressed, with increasing

suicidal ideation, during her sobriety from factitious behavior, despite being on the mood

stabilizers Lithium, Lamictal, Tegretol, Depakote, and Abilify, and on the antidepressants

Welbutrin, Effexor, Zoloft, Desipramine, Cymbalta and Noritriptyline, as well as Campral,

Naltrexone and low dose Suboxone to try to help with her cravings.  Tr. 545-46.   On September

26, 2006, Dr. Rice decided to try Ms. Cook on Parnate.  Tr. 554.   On October 17, 2006, Dr. Rice

noted that Ms. Cook reported being less depressed and sad, with less suicidal ideation, but still

thinking often of self-injury.  Tr. 553.  On November 2, 2006, Ms. Cook told Dr. Rice she was

thinking hourly of ways to injure herself, and that she had injured herself in "small ways such as

minor cuts."  Tr. 552.  On February 7, 2007, Dr. Rice wrote that Ms. Cook "had major

breakthroughs in her work with Mary Goldstein in group therapy," but that she remained "very

depressed."  Tr. 547.

On December 30, 2006, Ms. Cook was admitted to the hospital after she cut herself on

the left palm with a knife.  Tr. 714-15.  The wound was sutured, but the sutures were bothering

her so she removed them.  She had cut both flexors to the little finger and the ulnar nerve to the

ring and little finger, for which she had surgical debridement and repair on January 4, 2007.  Tr.

614-617, 541.

Ms. Cook was admitted to the hospital on April 4, 2007, for treatment of a turbovarian

abscess.  Tr. 601-606.  In May 2007, she was admitted to the hospital for suspected abdominal

abscess based on a CT scan that revealed gas in the abdomen, fever, and rapid pulse.  Tr. 587-

600.  She was put on antibiotics but continued to complain of pain. Her physician revealed that

she had been "backsliding," with intentional injury of her left knee within the previous month.

Tr. 595.  She was transferred to Good Samaritan Hospital in Portland for further evaluation.  Tr. 587.

On August 22, 2007, Ms. Cook was seen for pain and swelling of the left foot and leg. Tr. 626-31.  A foreign metallic body was observed in an x-ray.  *Id.*  On September 11,  2007, Ms. Cook was admitted to the hospital with infected open wounds on her left foot, accompanied by fever, chills and joint pain.  Tr. 582.  Bryan Conklin, M.D., recorded that Ms. Cook had told him that about a month earlier, she had stepped on a nail-studded board and punctured her left heel. She then began to introduce additional nails into the previous puncture wound sites, but because she did not want an infection, she coated the nails with neosporin.  She developed pain, chills, fever, and nausea.  Tr. 578.  On October 4, 2007, an abscess on her heel was lanced and drained, but she continued to have swelling, pain, and difficulty moving her ankle.  Tr. 567.  On October 15, 2007, she had surgical debridement of infected bone and placement of bone graft material in the left heel.  Tr. 575-577.

On April 24, 2008, Ms. Cook was seen after cutting her right ring finger with a pruner. She had a red streak extending up the radial side of the finger, which was thought to be early cellulitis and infection.  Tr. 726.  She was admitted to the hospital to begin IV antibiotics and undergo surgical debridement, but she had virtually no peripheral IV sites.  Tr. 739.  She was eventually taken to the OR and a central line was started.  *Id.*  On April 28, the finger was debrided, but on May 2, 2008, the finger was amputated through the middle phalanx.  Tr. 41-42. The surgeon, Donald Warren, M.D., noted that he had operated on her "at least 6 times for various self-inflicted injuries."  Tr. 738.  Cultures obtained at the time of the surgery grew E. coli and Enterobacter faecalis (gastrointestinal flora).  Tr. 739.

Findings and Recommendation Page 13

On June 26, 2008, Dr. Rice wrote a letter on Ms. Cook's behalf, stating that he was

treating her for Bipolar II Disorder, Factitious Disorder, Eating Disorder, and hypothyroidism.

Tr. 728.  Dr. Rice continued:

> Her Factitious Disorder is really a form of addiction to self-injury.  She began
> injuring or attempting to injure herself at an early age and the compulsion to
> injure herself and/or feign illness has dominated her adult life.  This compulsion is
> as strong as the compulsion of an advanced heroin or methamphetamine addict.
> This spring, for example, during a change in her antidepressant medication she cut
> her finger off.  While she has stayed in treatment since 2005 when her primary
> care provider and I orchestrated an "intervention," and made great strides the
> fragility of her condition is demonstrated by her recent self-amputation. She
> remains extremely susceptible to ordinary stress.
>
> Unfortunately, her Bipolar Disorder has been resistant to many
> pharmacotherapeutic and psychotherapeutic trials.  She continues to cycle in
> mood and neurovegetative profile and is frequently in a mixed mood state.  These
> are all poor prognostic indicators.
>
> She has been unusually honest and thoughtful during the course of her treatment.
> She has dealt with the shame and guilt of dealing with a severe but poorly
> understood addiction in a small town.  I have been quite impressed by her
> character strength and structure.
>
> Nevertheless, I think she may never be able to handle the stress of usual
> employment and certainly would not be ready for this for many years.  I usually
> strongly encourage employment because working is ordinarily very good for
> mental health.  In Mrs. Cook's case I think she is simply not capable of such work
> without a very high likelihood of psychiatric deterioration.  In her case psychiatric
> deterioration would mean severe self-injury or suicide.

Tr. 728-29.  On July 18, 2008, Dr. Rice wrote a letter stating, "I absolutely believe that her

disability began before September 30, 1998."  Tr. 727.

On September 21, 2008, Ms. Cook was admitted to Emanuel Hospital for an infected left

leg wound.  Tr. 731-37.  She reported that four weeks earlier, she fell on a stick that went

approximately six inches into her left calf.  Tr. 735.  Ms. Cook said she initially tried to treat the

wound herself.  *Id.*  She was admitted to Grande Ronde Hospital, "where the orthopedist surgeon

there refused to treat her as he has treated her before and has discharged her."  Tr. 731.  Culture

results showed multiple gram-negative organisms in the wound.  *Id.*  The wound was irrigated

and debrided on September 21 and again on September 24.  Tr. 731-34.

On March 1, 2009, Dr. Rice wrote a letter on Ms. Cook's behalf.  Dr. Rice stated that in

his opinion, Ms. Cook had been

> unable to continuously work in even a very low stress environment without
> decompensating or otherwise risking increased severe or substantial self-harming
> activity (which has been the nearly lethal hallmark of her psychiatric condition)
> since at least September 1996 . . . and that this inability to continuously work has
> continued through the present as a direct result of her severe mental impairments.

> Her Axis I diagnoses for this period include Factitious Disorder NOS [Not
> Otherwise Specified], Impulse Control Disorder NOS and Bipolar II Disorder.
> Although her condition has waxed and waned somewhat her average estimated
> GAF[4] for this time period is 38.

> I base my opinion on my first hand clinical experience with Ms. Cook since
> 9/21/06, a review of the material I have received from other sources since I began
> treating her, . . . the known or reasonable expected course of such problems,
> including the tendency of such sufferers to hide the severity of the ongoing self-
> harm, and the reasonable medical inferences that the total of all available material
> allows.  Such inferences are typically made by psychiatrists that treat this type of
> disorder, as, like in this case, the victim typically makes great and generally
> successful efforts to hide the nature, extent, and frequencies of the self-harming
> behaviors and their triggering events.

Tr. 827-28.

## HEARING TESTIMONY

---

[4] The Global Assessment of Functioning ("GAF") scale is divided into 10 numerical
ranges, each representing an individual's overall level of functioning.  The description of each
10-point range has two components: symptom severity and functioning.  A GAF falling within
the range of 31-40 is described as follows: "Serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job)."  *DSM-IV-R* at 34.

The ALJ called a medical expert, Robert McDevitt, M.D., a psychiatrist. Dr. McDevitt observed that the medical evidence showed Ms. Cook was not diagnosed with Factitious Disorder until October 2005; Ms. Cook acknowledged that she "didn't admit to it" until that time. Tr. 36. However, Dr. McDevitt thought "the problem is philosophically she probably had this disorder back in 1998." Tr. 37. He noted that after the diagnosis in 2005, she "mentally was worse, and actually continued with her factitious disorder." Tr. 37-38. Dr. McDevitt explained,

> I think the big problem is with an issue like this, ten years of concealing this type of self-injuring behavior . . . obviously she had these problems years ago, but concealed them from the physicians, from her family, and I guess from her friends . . . . And of course, over the years with this particular self-injuring behavior and issues, physically she's at considerable disability. The treatment of these disorders, because they were caused by intestinal bacteria, usually involves some heavy duty medication that caused severe problems.

Tr. 38.

Dr. McDevitt noted the absence of medical documentation of Ms. Cook's mental disorders between 1995 and 2005, because "part of the disease disorder was hiding from other people what she was doing." Tr. 39-40, 43. On the other hand, Dr. McDevitt reiterated that "[s]he did have this at least ten years ago." Tr. 41. He found "evidence in the clinical record that there was [sic] self-induced infections as far back as" July 31, 1995," but that "nobody went behind the behavior at that point." Tr. 45.

In response to a question from the ALJ about whether Ms. Cook satisfied the criteria for any of the disorders on the Listing of Impairments,[5] Dr. McDevitt opined that Ms. Cook's mental

---

[5] In order to qualify as disabled at step three of the sequential evaluation, a claimant must meet or exceed the listed impairments in Appendix 1 to Part 404 of the Social Security regulations. 20 C.F.R. § 404.1520(d). To meet a listing in Appendix 1 for a mental disorder, a claimant must satisfy the criteria in paragraph A of the listed impairment, which medically substantiates the presence of a mental disorder, and the criteria in paragraphs B or C, which

disorders satisfied the requirements of sections 12.04[6] and 12.08[7] between 1995 and 1997 and on

her date last insured.  Tr. 42-44, 48, 56.  He believed that for both listings, she satisfied the

requirements of paragraph A and of paragraph C, based on frequent episodes of decompensation,

the threat of decompensation whenever she was confronted with even minimal increases in

---

describe the functional limitations associated with the disorder which are incompatible with the
ability to work. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A; Holohan v. Massinari, 246 F.3d
1195, 1203 (9th Cir. 2001).


   [6] Section 12.04 pertains to affective disorders.  Paragraph A requires medically
documented persistence, continuous or intermittent, of one of the following: depressive
syndrome, manic syndrome, or bipolar syndrome.  Paragraph B requires that the syndrome result
in at least two of the following: marked restriction of activities of daily living; marked difficulties
in maintaining social functioning; marked difficulties in maintaining concentration, persistence,
or pace; or repeated episodes of decompensation, each of extended duration.  Paragraph C
requires a medically documented history of a chronic affective disorder of at least two years'
duration that has caused more than a minimal limitation of ability to do basic work activities,
with symptoms or signs currently attenuated by medication or psychosocial support, and one of
the following: repeated episodes of decompensation, each of extended duration; a residual
disease process that has resulted in such marginal adjustment that even a minimal increase in
mental demands or change in the environment would be predicted to cause the individual to
decompensate; or a current history of one or more years' inability to function outside a highly
supportive living arrangement, with an indication of continued need for such an arrangement.  20
C.F.R. Subpt. P, App. 1 § 12.04.


   [7] Listing 12.08 pertains to personality disorders.  Paragraph A requires: "Deeply
ingrained, maladaptive patterns of behavior" associated with one or more of the following:
seclusiveness or autistic thinking; pathologically inappropriate suspiciousness or hostility;
oddities of thought, perception, speech and behavior; persistent disturbances of mood or affect;
pathological dependence, passivity, or aggressivity; or intense and unstable interpersonal
relationships and impulsive and damaging behavior.  Paragraph B requires that the condition
result in at least two of the following: marked restriction of activities of daily living; marked
difficulties in maintaining social functioning; marked difficulties in maintaining concentration,
persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20
C.F.R. Subpt. P, App. 1 § 12.08.

mental demands, and a history of supportive living arrangements.[8]  Tr. 51.  He acknowledged that Ms. Cook's limitations "between episodes of infection" were mild, but observed that she did have frequent decompensation, each episode lasting for several weeks.  Tr. 47.

Ms. Cook testified that her treatment with Dr. Rice was helping her, in that the "hospitalizations are getting farther and farther apart."  Tr. 67.  She said that between August 1995 and September 1998, her husband was working full time and she was caring for the children, but her mother had come and stayed every three or four months, "every time I fell apart," remaining until Ms. Cook could "get it together again," which was "sometimes months." Two years before the hearing, her mother had moved in order to live near them.  Tr. 68-69.  Ms. Cook testified that her mother had helped her out "pretty much my whole life," and that she also had family friends who helped her with her children.  Tr. 69. Ms. Cook testified that her mother "would come and live with us and cover for me" during a four to five year period when Ms. Cook was doing after-school day care in her home for one child, 10-12 hours a week.  Tr. 62.

Asked by her attorney whether, from 1995-1998, she had injured herself but not received medical care that was documented in the medical record, Ms. Cook answered in the affirmative. Tr. 69.  She related that when she felt stressed, she swallowed dish detergent, slammed her hand in the car door, drank syrup of  ipecac, cut herself, and inhaled bleach to mimic the symptoms of a bad cold.  Tr. 69-70.  She said  she did not injure herself in order to go to the doctor; "[i]t was just so I didn't have to cope with life."  Tr. 70.  She had been engaging in this behavior since she

---

[8] The psychiatric definition of "decompensation" is: "Recurrence or exacerbation of an illness, and in particular schizophrenia, because the mechanisms that had served to correct it are no longer adequate to maintain an acceptable or desirable level of functioning."  R. Campbell *Campbell's Psychiatric Dictionary* 255 (9th ed. Oxford).

was "10 or 11 years old."  Tr. 71.  "I can go for a month or two where I don't do anything as long

as I can keep the stress level calm."  Tr. 71.  Asked what kinds of stress would trigger an episode

of self-injury, Ms. Cook responded, "[t]his court thing," marital trouble in 1995, the move from

Texas to Oregon in 1998, her daughter's departure to be an exchange student in Brazil, and the

death of her grandfather.  Tr. 71, 73.  She said, "[O]nce it gets on a roll it's like an addiction.  It

just–it's really hard to stop."  Tr. 72.

## ALJ'S DECISION

The ALJ found that Ms. Cook's Factitious Disorder and Bipolar Disorder II were severe

impairments, but that they did not, singly or together, meet any of the listed impairments.  The

ALJ wrote that she did not believe the paragraph B or C criteria were not met because there were

neither marked limitations nor repeated episodes of decompensation, because the latter required

three episodes of decompensation within one year, or an average of once every four months, each

lasting for at least two weeks.  Tr. 23.

The ALJ rejected Dr. McDevitt's opinion that Ms. Cook met the requirements for

sections 12.04 and 12.08 of the Listing of Impairments because 1) Ms. Cook was able to care for

her children while her husband worked; 2) there were no medical records referring to social

difficulties; and 3) Ms. Cook had been "fairly functional" until April 2001; and there was no

evidence of four or more episodes of decompensation between the alleged onset date to the date

last insured (i.e., between September 1996 and September 1998).[9]  The ALJ concluded that

between the alleged onset date and the date last insured, Ms. Cook had "one to two" episodes of

---

[9] The ALJ has apparently assumed that only hospitalization for a self-inflicted injury
constitutes an episode of decompensation, but there is no medical evidence in the record or
testimony from Ms. Cook to support this assumption.

decompensation. Tr. 24-25.  The ALJ found "no evidence" to satisfy any of the criteria of Bipolar

Disorder.  Tr. 25. The ALJ concluded that "the medical treatment during much of the time from

the alleged onset date of disability through the date last insured was mostly conservative;" the

ALJ acknowledged that Ms. Cook was "hospitalized on various occasions after the date last

insured," but found that her "condition was fairly stable and without repeated episodes of

decompensation during the period at issue."  Tr. 26.  The ALJ found that Ms. Cook was "able to

control the disorders at times," citing evidence that she had not hurt herself during her pregnancy

with her daughter in 1996, "except for allegedly slamming her hand in doors and burning."  Tr.

27.  However, the ALJ noted that there was no medical evidence relating to those incidents,

indicating that the "alleged injuries were not severe enough to require treatment."  Tr. 27.

The ALJ rejected the letters provided by Dr. Rice on the ground that Dr. Rice had not

begun treatment with Ms. Cook until September 21, 2006, "so he has no first hand knowledge of

what her symptoms were or what medical findings there were before September 2006."  Tr. 29.

The ALJ thought Dr. Rice's opinions were "not based on objective evidence, but rather he

appears to be acting as an advocate for the claimant."  Tr. 29.

The ALJ concluded that Ms. Cook, despite her impairments, had the residual functional

capacity ("RFC") to perform a full range of "simple or detailed work" at all exertional levels.  Tr.

25, 29.  She found Ms. Cook's testimony "not fully credible to the extent [it is] inconsistent

with" the ALJ's RFC assessment.  Tr. 26.

The ALJ found that because Ms. Cook had worked between 1986 and 1992, "after she

states she started having problems with a factitious disorder," and because Ms. Cook testified

that she did "daycare for a small income in approximately 1999 or 2000" and more recently had

Findings and Recommendation Page 20

"performed volunteer work for the parent-teacher association and the local swim club," she had

the "ability to work even with her medical conditions." Tr. 27. The ALJ concluded that Ms.

Cook was not disabled because she was capable of performing past relevant work as an

administrative assistant, receptionist, and accounting clerk. Tr. 29.

## STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on proper legal standards

and the findings are supported by substantial evidence in the record as a whole. Meanel v. Apfel,

172 F.3d 1111, 1113 (9th Cir. 1999). The initial burden of proving disability rests on the

claimant. Meanel, 172 F.3d at 1113. To meet this burden, the claimant must demonstrate an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment" which "has lasted or can be expected to last for a continuous

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. § 423(d)(3).

## DISCUSSION

1.   Consideration of RFC

Ms. Cook asserts that the ALJ's RFC finding was not supported or explained by any

medical evidence. She argues that the ALJ stated merely that she was not adopting the opinions

of treating psychiatrist Dr. Rice or medical expert Dr. McDevitt, but failed to cite any medical

evidence in the record that conflicted with or undermined the opinions of Doctors Rice and

McDevitt, or that supported the ALJ's RFC findings. I agree. The ALJ's findings must be based

on substantial evidence in the record.  Meanel, 172 F.3d at 1113.  There is no evidence whatever

in the record to support the ALJ's finding that Ms. Cook had the RFC to perform work at all

exertional levels, whether simple or detailed.

        2.        Rejection of opinions of Doctors Rice and McDevitt

In disability benefits cases, physicians typically provide two types of opinions: medical

opinions that speak to the nature and extent of a claimant's limitations, and opinions concerning

the ultimate issue of disability, i.e., opinions about whether a claimant is capable of any work,

given her or his limitations.  Holohan v. Massinari, 246 F.3d 1195, 1202 (9th Cir. 2001).  Under

the regulations, if a treating physician's medical opinion is supported by medically acceptable

diagnostic techniques and is not inconsistent with other substantial evidence in the record, the

treating physician's opinion is given controlling weight. Id.; 20 C.F.R. § 404.1527(d)(2); Social

Security Ruling (SSR) 96-2p. An ALJ may reject the uncontradicted medical opinion of a

treating physician only for "clear and convincing" reasons supported by substantial evidence in

the record. Id.  Similarly, an ALJ may reject a treating physician's uncontradicted opinion on the

ultimate issue of disability only with "clear and convincing" reasons supported by substantial

evidence in the record. Id.

There is no evidence in the record that is inconsistent with  Dr. Rice's opinions with

respect to either Ms. Cook's limitations or the issue of her disability.  While Dr. McDevitt opined

that there were no medical records which established a diagnosis of Factitious Disorder before

2005, he opined that Ms. Cook "probably" had Factitious Disorder as of 1998, or "at least 10

years ago."  Dr. McDevitt observed that the diagnosis was made difficult because part of the

disease was concealment of her self-injuring behavior; because the episodes of decompensation

were not always severe enough to be documented in medical records; and because when Ms.

Cook was not decompensating, she functioned fairly well. Nevertheless, Dr. McDevitt thought

the self-injuring behavior caused "considerable" physical disability from both the injuries

themselves and the extensive treatment required.  Dr. McDevitt thought Ms. Cook's Bipolar

Disorder and Factitious Disorder were severe enough to satisfy the criteria of the Listing of

Impairments. The agency reviewing psychologists offered no opinions with respect to limitations

or disability.

　　　　The ALJ's reasons for rejecting Dr. Rice's opinions were neither clear nor convincing.

The ALJ rejected Dr. Rice's opinions on the grounds that he had no "first hand knowledge" of

her symptoms or of medical findings before he began treating her in September 2006 and because

the ALJ thought his opinions were "not based on objective evidence," and showed that Dr. Rice

was "acting as an advocate" for Ms. Cook.  The absence of "first hand knowledge" of a patient's

symptoms before treatment begins is not a convincing reason for rejecting the opinion of any

medical practitioner.  Although the ALJ chose to characterize Dr. Rice as an "advocate" for Ms.

Cook, this is the ALJ's subjective opinion, unsupported by substantial evidence in the record.

　　　　Dr. McDevitt's opinions were not contradicted by any other medical source, except that

Dr. Rice thought the onset of Ms. Cook's mental illness occurred before her date last insured

while Dr. McDevitt was somewhat equivocal on that issue.  The ALJ rejected Dr. McDevitt's

opinion that Ms. Cook met the requirements for sections 12.04 and 12.08 of the Listing of

Impairments because 1) Ms. Cook was able to care for her children while her husband worked; 2)

there were no medical records referring to social difficulties; 3) Ms. Cook had been "fairly

functional" until April 2001; and 4) there was no evidence of four or more episodes of

Findings and Recommendation Page 23

decompensation between the alleged onset date to the date last insured. None of these reasons is based on substantial evidence in the record.

There is significant and uncontradicted evidence in the record that Ms. Cook was able to care for her children while her husband worked because she had constant support from her mother and additional support from family friends. Social difficulties–in the form of multiple episodes of self-injury triggered by even minimal stress–is well documented in the medical records of Ms. Cook's hospitalizations and in Dr. Rice's opinions. The ALJ's finding that Ms. Cook was "fairly functional" until April 2001 is a selective and oversimplified characterization of the medical evidence that Ms. Cook was hospitalized four times between July 1995 and April 2001 for serious self-inflicted injuries.

Both Dr. McDevitt and Dr. Rice stated that the nature of Ms. Cook's illnesses is such that she can function only so long as a stressor does not trigger an episode of self-injury. The ALJ's findings with respect to the frequency and severity of Ms. Cook's episodes of decompensation is apparently based on the misconception that only injuries whose consequence is a prolonged period of hospitalization constitutes decompensation. There is no evidence in the record to support the ALJ's assumption, and it is is not consistent with the dictionary definition of decompensation or with Ms. Cook's testimony and the opinions of Dr. Rice. The ALJ's finding that between the alleged onset date and the date last insured, Ms. Cook had "one to two" episodes of decompensation is unsupported by substantial evidence in the record.

The ALJ's finding that Ms. Cook's medical treatment between the alleged onset date and the date last insured was "mostly conservative" is difficult to justify in view of the evidence, even from Dr. Neeley, that between July 1995 and February 1997, she had two extended hospital

stays for severe self-inflicted injuries that included incision and drainage surgeries and IV antibiotics.

I conclude that the ALJ failed to offer clear and convincing reasons, supported by substantial evidence in the record, for the rejection of Dr. Rice's opinions. Consequently, Dr. Rice's opinions are entitled to controlling weight. See also Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir. 2000) (uncontradicted medical opinions that have been improperly rejected by the ALJ may be credited as true by reviewing court).

     3.     Error at step four

Ms. Cook testified that she worked as an accounting clerk at Willamette Industries for a year and a half, but left in 1992; and that she worked as an administrative assistant, "kind of a receptionist," at Commercial Factors six years before working at Willamette Industries. On the basis of this testimony, the ALJ concluded that Ms. Cook was able to perform these past relevant jobs. The ALJ's conclusion is unsupported by substantial evidence in the record and is legally erroneous.

Although the burden of proof lies with the claimant at step four, the ALJ still has a duty to make the requisite factual findings to support a conclusion that the claimant is capable of performing his or her past work. Pinto v. Massanari, 249 F.3d 840, 844 (9th Cir. 2001); SSR 82-62; 20 C.F.R. §§ 404.1571 and 416.971, 404.1574 and 416.974, 404.1565 and 416.965. This is done by looking at the claimant's RFC and the physical and mental demands of the claimant's past relevant work. Pinto at 844-45; 20 C.F.R. §§ 404.1520(e) and 416.920(e). The claimant must be able to perform:

     1.     The actual functional demands and job duties of a particular past relevant job; or

> 2.      The functional demands and job duties of the occupation as generally required by
>         employers throughout the national economy.

Pinto at 845; SSR 82-61. This determination requires "specific findings as to the claimant's residual functional capacity, the physical and mental demands of the past relevant work, and the relation of the residual functional capacity to the past work." Pinto at 845; SSR 82-62.

The ALJ failed to comply with any of these directives. She made no specific findings about Ms. Cook's RFC; no findings about the physical and mental demands of Ms. Cook's past relevant work, either as performed or as generally required by employers; and no findings about the relationship between the RFC and the past work. The ALJ's step four findings are legally erroneous.

### 4.      Remand

Sentence four of 42 U.S.C. § 405(g) gives the court discretion to decide whether to remand for further proceedings or for an award of benefits. Harman, 211 F.3d at 1179.

In Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1986), the court held that improperly rejected evidence should be credited and an immediate award of benefits be made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

The three conditions are met here. Accordingly, I recommend that this case be reversed and remanded for the payment of benefits.

Findings and Recommendation Page 26

**SCHEDULING ORDER**

These Findings and Recommendation will be referred to a district judge.  Objections, if any, are due May 16, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due14 days after the date of filing of said objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 29th day of April, 2011.


/s/ Patricia Sullivan                             
Patricia Sullivan
United States Magistrate Judge

Findings and Recommendation Page 27